**Bobby Charles CRAVER, Appellant
(Defendant),**

v.

**The STATE of Wyoming,
Appellee (Plaintiff).**

No. 96–156.

Supreme Court of Wyoming.

July 22, 1997

Sylvia Lee Hackl, State Public Defender; Donna Domonkos, Appellate Counsel; Michael Dinnerstein, Director, Wyoming Defender Aid Program; Raymond D. Macchia and Amy M. Taheri, Student Interns, Wyoming Defender Aid Program, for Appellant.

William U. Hill, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Sr. Assistant Attorney General; Georgia L. Tibbetts, Sr. Assistant Attorney General; Theodore E. Lauer, Director, Prosecution Assistance Program; Michael A. Iozzo, Student Intern, Prosecution Assistance Program, for Appellee.

Before TAYLOR, C.J., and THOMAS, MACY, GOLDEN and LEHMAN, JJ.

GOLDEN, Justice.

Appellant Bobby Charles Craver appeals his conviction and sentence of two felony counts of obtaining property by false pretenses. We affirm.

## ISSUES

Craver presents these issues for our review:

1. Did the State fail to prove that Appellant ever intended to defraud anyone?

2. Did the trial court deny the Appellant his due process right to a fair trial by failing to order a continuance to obtain a material witness necessary for presenting the Appellant's defense?

3. Did the trial court err by allowing the judgment of a civil court in a criminal trial, causing prejudice to the Appellant and a diminished burden of proof on the State?

The issues of the State are:

I. Was there sufficient evidence for the district court to find Appellant guilty beyond a reasonable doubt of obtaining property by false pretenses?

II. Did the district court abuse its discretion when it denied Appellant's motion for a mistrial because the whereabouts of a witness had become unknown?

III. Did plain error occur when a witness who testified to uncharged dealings with Appellant stated that she had obtained a civil judgment against Appellant?

## FACTS

On September 16, 1994, Craver and a citizen of Wheatland, Wyoming, Jerry Orr, entered into a contract for Craver, doing business as Custom Craft Masters, Incorporated, (Custom) to install siding on Orr's home. The contract represented that Craver was incorporated and was licensed, bonded, and insured. The total cost was to be $4,725.00, and Orr gave Craver a check for $2,362.50. Work was to be completed by October 1, 1994. Craver did not return to complete the work and did not return Orr's numerous phone calls until after Orr contacted the police. The police determined Craver was not licensed or bonded as he had claimed, and an agent for the Wyoming Division of Criminal Investigation determined that his company was not incorporated. In January of 1995, Craver called Orr, stated he had heard there was a warrant out for his arrest, and offered to install the siding. Orr refused. Shortly after that, Craver traveled to Arizona.

On July 28, 1994, Craver and another citizen of Wheatland, Chanae Dennewitz, had entered into a contract for Custom to install siding, windows, and doors on her double-wide home at a cost of $17,620.25. Dennewitz paid $100.00 cash down and signed a mortgage contract with a finance company, AVCO, to pay for the rest. Dennewitz signed over the check from AVCO to Craver. Craver installed the siding, but did not complete the siding work and has never installed the windows or doors. The siding that he installed was not finished or vented, and Dennewitz expects damage to her flooring. Dennewitz attempted to contact Craver the next three to four months by phone and certified mail but was unsuccessful. Craver did not return any of her money; however, Dennewitz continues to repay the loan. At the time of trial, Dennewitz had filed suit against Craver.

On January 9 and July 3, 1995, Craver was charged with obtaining property valued at more than $500.00 by false pretenses, with the intent to defraud Orr and Dennewitz, and had a trial without a jury beginning December 4, 1995. The State had filed notice that it would use prior acts of uncharged misconduct and, before trial, the court ruled this evidence admissible. Janette L. Chambers, a school teacher living in Glendo, Wyoming, testified that, on July 15, 1992, she had contracted with Craver to have a metal roof put on her house for $5,700.00 and had given Craver a check for $2,500.00 as down payment, which cleared her account the following day. Craver, however, did no work on the roof. Over a year after the contract was made, Chambers told Craver that the work had to be started by August 26, 1993, and finished by September 1, but Craver did nothing. After Chambers contacted the Attorney General, Craver installed soffit and fascia worth about $216.00. Scott Walby testified that in the fall of 1993, Craver paid him $75.00 to install 48 feet of soffit and fascia on Ms. Chambers' house. He also measured the Chambers house to determine what materials would be needed. Mr. Walby split the $75.00 with his brother, who helped him, and although he and his brother were willing to continue working, Craver did not assign him further work on Chambers' house.

Lori Knighten testified that on July 7, 1994, she and her husband contracted with Craver to have siding work done and a window replaced on their home in Douglas. The contract amount was $11,200.00, and the Knightens gave Craver a check for $5,600.00. Craver said the work would be started on August 1 and completed in two to three weeks. However, Craver did not perform any work in August. The Knightens attempted repeatedly to contact Craver without success. Finally, at the end of October, Craver showed up with insulation and installed two windows. The next day, the house was "red-tagged" because Craver had been denied a building permit because he did not have any insurance. No further work was done by Craver; no siding was installed. The Knightens had to hire someone else and pay again to have the work completed. The Knightens brought suit against Craver in Converse County and obtained a judgment which remained unpaid; however, they did take possession of Craver's tools in November of 1994 but later returned them.

Rebekha McCartney testified that she entered into a contract with Craver on August 14, 1994, to do insulation and siding work on her home in Wheatland. A check for $3,775.00 was given to Craver on that date upon his promise that the work was to be completed within a week. However, Craver did not show up to perform the work until September 23, and did not finish until October 5th. Although the work was completed, the siding fell off, and McCartney had to pay a construction company $2,650.00 to reapply the siding and replace some that had been damaged by falling.

Craver had seven satisfied customers testify for his defense concerning work he had performed between August of 1989 and December of 1994. Mark Strickland, a defense witness under subpoena, failed to show due to illness, and the court granted the defense a continuance until February 7, 1996. In February, Craver informed the court that Strickland had moved and could not be located. Arguing that Strickland was a material witness to the defense, Craver moved for a mistrial which the court denied. Craver tes-

tified that because he was in jail from January 1994, until March or April of 1994, he lost workmen and had difficulty replacing them. He testified that in January of 1995, he had hired Strickland as an applicator for Orr and purchased the materials for the job but that Orr's refusal to allow him on his property prevented him from performing the contract. He also testified that he had purchased Dennewitz's windows but had not received them. The judge found Craver guilty.

## DISCUSSION

In his first claim, Craver contends that the State failed to prove he had a criminal intent to defraud because it was Orr who had repudiated the contract when Orr told Craver not to come on to his property after Craver had called and said that he would send an installer on the next Monday and because he fulfilled the large part of his contract with Dennewitz. In his view, the State did not prove that Craver had the requisite intent not to perform on his contracts at the time that he entered them, and any deficiencies in his work are civil matters as evidenced by the civil suits filed against him and are not criminal conduct.

In Wyoming, convictions for the crime of obtaining property by false pretenses have been limited to misrepresentations of an existing or past fact. In *Driver v. State*, 589 P.2d 391 (Wyo.1979), this Court acknowledged that it had not yet decided whether a false promise of future action, which at the time of its making the promisor does not intend to perform, will constitute a false pretense under the Wyoming statute. *Id.* at 393. It remains an open question. At one time, most courts limited the crime of obtaining property by false pretenses to those cases of a misrepresentation of existing fact, but an increasing number of states are applying it to future acts. The reasoning for the change has been explained as follows:

> While a large number of jurisdictions, sometimes invoking the danger of persons who are guilty of no more than a breach of contract being held criminally liable, have continued to adhere to the traditional rule that the crime of obtaining money or property by false pretenses can only be predi-

cated upon a misrepresentation of a past or existing fact and not upon an intention not to comply with a promise or a statement as to a future act, an increasing number of jurisdictions, usually stressing the opportunities for fraud with impunity under the traditional rule, have held that a present intent not to comply with a promise or a statement as to a future act can be the basis of the crime of obtaining money or property by false pretenses.

Michael A. DiSabatino, Annotation, *Modern Status of Rule That Crime of False Pretenses Cannot Be Predicated Upon Present Intention Not To Comply With Promise Or Statement As To Future Act*, 19 A.L.R.4th 959, 964 (1983).

Because early common law did not recognize the crime of obtaining property by false pretenses when the pretenses amounted to "merely a promise of future conduct, and common prudence and caution would have prevented any injury arising from it," it became a generally accepted notion that the failure to pay back money or use it as specified at the time of borrowing raised the concern that disgruntled creditors will instigate criminal proceedings against those who blamelessly encounter ordinary commercial defaults. *People v. Ashley*, 42 Cal.2d 246, 267 P.2d 271, 280–82 (1954), *cert. denied*, 348 U.S. 900, 75 S.Ct. 222, 99 L.Ed. 707 (1954). It is thought by some that allowing the crime to include cases involving future conduct would create a considerable risk of prosecuting one who is guilty of nothing more than a failure or inability to pay his debts. *Commonwealth v. True*, 16 Mass.App.Ct. 709, 455 N.E.2d 453, 454 (1983); *Ashley*, 267 P.2d at 282.

We, however, agree with the conventional wisdom of *Ashley*, and a growing number of courts that this result is avoided because something more than mere nonperformance is required to prove the defendant's intent not to perform his promise, and proof of nonperformance alone is not sufficient in criminal prosecutions based on false promises. *True*, 455 N.E.2d at 454; *State v. Aurgemma*, 116 R.I. 425, 358 A.2d 46, 49–50 (1976); *Ashley*, 267 P.2d at 282. Specific intent is an essential element of the crime of

obtaining property by false pretenses in Wyoming. In order to succeed in a prosecution for a promise to perform future acts, the State is required to prove that a defendant had the intent not to perform a promise as well as the falsity of the promises/pretenses, that property was obtained by reason of the pretenses, and the knowledge of the accused of their falsity. *Lopez v. State,* 788 P.2d 1150, 1152 (Wyo.1990); *Miller v. State,* 732 P.2d 1054, 1063–64 (Wyo.1987). In this case, the trial judge specified the evidence which showed whether or not Craver had a criminal intent in this case:

> The rapidity with which the sales went bad, ..., almost immediately. It was obvious that the money went elsewhere rather than where it was supposed to go. And to me this showed a knowledge of the inability to perform when that money was received.
>
> Secondly, I noted the pattern of immediately unfulfilled promises.... The third thing I wrote down was that the defendant obviously took on new jobs without finishing old ones. He took on obligations to do things for people before he completed those old ones.
>
> My fourth comment was that I noted in the testimony, especially from the prior hearing that the defendant was giving the same excuses in 1994 that he was giving in 1992 and 1993 as to why he was not completing their work.... [T]he fifth thing was that he did not complete the projects, which I think is at least suggestive that he did not have an intent to complete the projects.
>
> In general what I'm saying is that in my view the 404(b) type evidence that was allowed in is evidence of specific intent in this case and knowledge on the part of the defendant.
>
> In addition, there are some specific things as far as the falsity that were pointed out. The evidence that he was not a corporation, although he claimed to be ... [and] there were questions about bonding and licensing and insurance. Once again today the number of years of experience or the years this business had been in operation when in truth it was not. And the use

of that information to get people to come up with additional money.

> One of the most telling things for me was the next item and that is this: What I saw as a repeated promise of immediate service in exchange for a down payment, then that immediate service never happened. I find that [this] is a very sound basis in this case for a finding of false pretenses. It's evidence of the falsity and it's also evidence of the intent to·defraud.
>
> Another matter that I noted was that all four of what I have called the bad cases that went bad, Orr, Dennewitz, Knighten, and McCartney, are basically the last four on the list in the chronology. The defendant was accepting money at this time after it was obvious that he could not perform on contracts that were already in existence. For instance, the Chambers' contract that had been in existence since July of 1992. Once again, obvious evidence to me of an intent to defraud.
>
> Another specific item, if the dates given to me in testimony were correct, the tools were not seized by the Knightens until November of 1994, long after most of the failures took place in this situation.
>
> The next note is that these contracts were entered into, ... after the jail time was served in early 1994. It's impossible for the court to see how the jail time served in 1994 could have prevented performance under these contracts. In fact, if anything, they should have been even more evidence for the defendant himself that he was not going to be able to perform as he entered into those contracts.
>
> I think the flight to Arizona and the use of an alias is additional evidence of criminal intent. The testimony seems to indicate to me that at the time these contracts were entered into, or at least some of them, particularly the last few, the defendant did not have and knew he did not have available workmen for the jobs that he contracted to do.
>
> In short, the court finds that the state has proven its case beyond a reasonable doubt on each of these two crimes.

The court's findings show that Craver's actions were more than mere nonperfor-

mance. Craver's defense and actions indicate that, after serving time in jail, Craver falsely represented that he had the capacity to properly and completely perform these promised services when, as he testified, he had lost his workers. This shows that, at the time that he took the money, he knew he could not provide labor to perform the work. Despite this, he moved from one victim to the next, taking money from Chambers in 1992, Knighten in early July of 1994, Dennewitz in late July, 1994, McCartney in August, 1994, and, finally, Orr in September of 1994. The court, as the trier of facts, weighed the evidence, including Craver's defense, and determined that Craver was not a bad businessman who was civilly liable but had acted with criminal intent by a pattern of conduct of promising services and taking money for those promised services without intending to perform by either purchasing the materials or securing the labor needed. *True,* 455 N.E.2d at 454; *Aurgemma,* 358 A.2d at 49–50; *Ashley,* 267 P.2d at 282. The evidence viewed in the light most favorable to the State supports the verdict.

### Denial of Motion for Mistrial

As our factual discussion states, when the trial resumed in February, defense witness Strickland was not present to testify, and the defense moved for a mistrial. Craver now contends he was denied a fair trial because the court failed to order a continuance to obtain a material witness necessary for presenting his defense. Because the record shows that he did not request a continuance, and based upon the content of his argument, we conclude that he is challenging the failure to grant a mistrial.

The decision to grant a mistrial rests within the sound discretion of the district court and will not be reversed unless an abuse of that discretion is shown to have prejudiced the defendant. *DeLeon v. State,* 894 P.2d 608, 612 (Wyo.1995). The district court denied the motion for mistrial, pointing out that Craver had not shown that granting a mistrial "would increase the likelihood for the ability of the defendant to actually locate Mr. Strickland" when the previous continuance had given him sixty days to try. The

court also noted that Craver had other witnesses testify for him. It is reasonable for the court to expect Craver to make a showing that all reasonable efforts had been used to locate the witness and for the court to consider what Strickland's testimony would have added to the case. The issue in this case was whether Craver made a promise of immediate performance in order to get a substantial amount of money from clients without intending to provide services. Strickland was to testify that he had been hired to side Orr's house. The Orr contract was signed in September of 1994, and Craver testified that he hired Strickland in January of 1995, several months after the contract was signed and after a warrant had issued for Craver. This testimony was not essential to Craver's case. We agree with the district court that Craver had not met his burden and that if mistrials were granted every time a witness could not be located most cases would not be resolved. We hold there was no abuse of discretion.

### Admissibility of Evidence

A State witness testified that she had obtained a civil judgment against Craver. Craver argues that a judgment in a civil action is not ordinarily admissible as evidence in a criminal trial because it diminishes the State's burden of proof to a preponderance of the evidence standard. In his case, he claims the State used the civil judgment as evidence of fraud and relies on the decision in *Hodges v. State,* 92 Okla.Crim. 176, 222 P.2d 386 (App.1950), that reversed a jury verdict when civil judgment evidence was introduced. He claims admission of this evidence prejudiced him, and without it the outcome of the trial may have been different.

We apply a plain error standard because Craver did not object to this specific testimony. Craver must demonstrate plain error with a showing that the record clearly shows an error that transgressed a clear and unequivocal rule of law which adversely affected a substantial right. *Compton v. State,* 931 P.2d 936, 938–39 (Wyo.1997). *Hodges* determined that introducing evidence of the civil judgment had no other purpose than that of leading the jury to believe, in the trial

of the criminal case, that the same issues had already been determined by another jury in the civil action. Finding this prejudicial to the criminal defendant, the Oklahoma court reversed.

 In this case, Craver was tried before the court and, as he concedes, the court made no mention of the civil judgment when he explained the reasons for his verdict. As explained in our sufficiency of the evidence treatment, the district court based its guilty verdict on sufficient, competent evidence, and we reject his contention that the outcome of his trial would have been different if this evidence had not been admitted.

The order of judgment of the district court is affirmed.